UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LAURA POWERS and CHRISTINA
ROSEAN,

        Plaintiffs,

v.                                  Case No: 6:23-cv-375-JSS-RMN

HEALTH FIRST, INC.,

        Defendant.

_____/

## ORDER

Health First, Inc., moves to dismiss Counts One, Three, and Four of the First Amended Class Action Complaint filed by Plaintiffs, Laura Powers and Christina Rosean, contending Plaintiffs failed to sufficiently plead the relevant product market. (Motion, Dkt 71.)  Plaintiffs oppose the Motion. (Dkt. 76.)  For the reasons set forth below, the Motion is denied.

## BACKGROUND[1]

Plaintiffs are residents of Brevard County whose family members received medical care at one of Health First's Brevard County hospitals located in Brevard County pursuant to Plaintiffs' insurance plans. (Dkt. 56 ¶¶ 5–6.)  Defendant started conducting business in 1995. (*Id.* ¶ 7.)  Since then, no new hospital has entered the

---

[1] The court accepts the well-pleaded factual allegations in the amended complaint as true and construes them in the light most favorable to Plaintiffs. *See Harry v. Marchant*, 291 F.3d 767, 769 (11th Cir. 2002) (en banc).

area except for Wuesthoff Medical Center's entry into the market. (*See id.* ¶¶ 52, 55, 58, 87.) Plaintiffs allege that Defendant fought hard to prevent Wuesthoff Medical Center's 2002 entry into the market. (*Id.*) As Plaintiffs assert, the lack of competition is due to Defendant's monopoly over physicians and health plans in Southern Brevard County caused by Defendant's ability to leverage its vertically integrated business model as a network of healthcare providers and a health insurance plan provider. (*Id.* ¶¶ 3, 29–41.) Plaintiffs define the geographic market as Brevard County or Southern Brevard County. (*Id.* ¶ 29.)

According to Plaintiffs, Defendant's expansive share in the Market and its vertically integrated business model give Defendant the ability to (1) illegally control physician referrals to limit referrals to other competing acute care hospitals and physicians, (2) induce and obtain preferential vertical agreements with competing health plans, physicians, and other providers, (3) threaten and deter competitors from entering the market, and (4) enter a horizontal market division agreement with an acute care competitor to divvy up the market as they see fit, which in turn stifles actual competition in the geographic market. (*Id.* ¶¶ 17–137.) Plaintiffs further allege that Defendant's conduct leads to uncompetitive high prices for consumers seeking care in the geographic market and stifles care for Defendant's health plan policyholders. (*Id.* ¶¶ 3, 131–37.)

On March 1, 2023, Plaintiffs filed their initial Class Action Complaint asserting four causes of action: (1) Count One monopolization of the relevant market in

violation of Section Two of the Sherman Act, 15 U.S.C. § 2; (2) Count Two horizontal market division in restraint of trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1;  (3) Count Three exclusive dealing in violation of Section One of the Sherman Act, 15 U.S.C. § 1; and (4) Count Four violation of the Florida Antitrust Act, Fla. Stat. § 542.19. (Dkt. 1 ¶¶ 129–56.)  On May 5, 2023, Health First moved to dismiss all of the complaint arguing that Plaintiffs' definition of the relevant product market was deficient because it did not describe what constituted "acute care" as contained in the relevant market definition, did not address the reasonably interchangeable substitutes of the acute care market as contained in the relevant market definition, and failed to plausibly allege facts to support the claim that Defendant, and its alleged potential competitor Adventist Health, illegally agreed to divide the product market. (Dkt. 27 at 9–23.)

On September 7, 2023, the court granted Defendant's motion in part dismissing Counts One, Three, and Four because Plaintiffs' relevant product market as pleaded was deficient.  (Dkt. 53 at 11–18.)  Plaintiffs' initial complaint alleged that the relevant product market was:

> the sale of inpatient, emergency, and outpatient acute care at an acute care hospital by [Defendant] and competing hospitals. This acute care is a short-term health-care treatment that patients receive at a hospital to address a trauma or urgent need. Emergency or outpatient acute care may or may not require admission for overnight stays at the hospital providing care.

(Dkt. 1 ¶ 17.)   The court found that this relevant product market definition was deficient because the term "acute care" was not defined and thus encompassed a wide range of emergency or outpatient acute care—such as urgent care facilities, ambulatory surgery facilities, and doctors' offices that provide at least some form of acute care as competing non-hospital alternative services.  (Dkt. 56 at 15–17.)  The court reasoned that the vagueness prevented the court from assessing the reasonable interchangeability of substitutes as required by the Sherman Act.  (*Id.*)  Thus, Plaintiffs were permitted to file an amended complaint to revise their relevant product market definition.  (*Id.* at 18–19.)

On September 21, 2023, Plaintiffs filed their First Amended Class Action Complaint (Amended Complaint) asserting the same four causes of action.  (Dkt. 56.)  To remedy the deficiencies described above, Plaintiffs removed outpatient acute care from the relevant product market definition and added a specific definition for acute care.  (*Id.* ¶ 17).  Plaintiffs now allege that the relevant product market is:

> the sale of inpatient and emergency room care by  and competing acute care hospitals. The impatient care therein encompasses hospital medical claims for inpatient care containing place of service code ("POS") 21 (identifying inpatient facilities), as used by acute care hospitals for inpatient care in the normal course of their business under federal and state legal coding mandate. The emergency room care therein encompasses hospital medical claims for emergency room care containing the emergency room hospital POS code 23 (identifying emergency room facilities), as used by acute care hospitals in the normal course of their business under federal and state legal mandate.

*Id.*[2] Additionally, Plaintiffs added a detailed explanation to support their position that urgent care and like facilities are not interchangeable substitutes with emergency rooms.  (*Compare* Dkt. 1 ¶¶ 17–20, *with* Dkt. 52 ¶¶ 17–28.)  On October 19, 2023, Defendant filed the instant Motion arguing that the revised definition of the relevant product market is still deficient because Plaintiffs still fail to include non-hospital providers—such as urgent care facilities—that provide some of the services included in the product market definition as reasonably interchangeable substitutes for emergency room care.  (Dkt. 71 at 3.) Plaintiffs assert that Defendant is asking the court to improperly resolve a factual dispute over the relevant product market definition at the pleading stage.  (Dkt. 76 at 1–2.)

## APPLICABLE STANDARDS

In deciding a motion to dismiss for failure to state a claim, a court "accept[s] the allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff."  *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

---

[2] "Place of Service Codes are two-digit codes placed on health care professional claims to indicate the setting in which a service was provided. . . . POS information is often needed to determine the acceptability of direct billing of Medicare, Medicaid[,] and private insurance services provided by a given provider." *Place of Service Codes*, *CMS.gov*, https://www.cms.gov/MEDICARE/CODING-BILLING/PLACE-OF-SERVICE-CODES (last visited Sept. 5, 2024.)

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*
"[D]etailed factual allegations" are generally not required, but "[a] pleading that offers
'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action
will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Generally, when analyzing
a motion to dismiss for failure to state a claim, a court considers only the four corners
of the complaint. *See Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023).

## ANALYSIS

The court will discuss Defendant's argument seeking to dismiss Plaintiffs'
Sherman Act claims before turning to Plaintiffs' Florida Antitrust Act claim.

### A. Sherman Act (Counts One and Three)

Section One of the Sherman Act prohibits "[e]very contract . . . combination . .
. or conspiracy, in restraint of trade or commerce among the several States. 15 U.S.C.
§ 1. Section Two of the Sherman Act makes it illegal to monopolize, or attempt to
monopolize, or combine, or conspire with any other person or persons, to monopolize
any part of the trade or commerce among the several States." 15 U.S.C. § 2. In
interpreting Section One of the Sherman Act, the Supreme Court has adopted the "rule
of reason" standard for claims similar to the ones at issue here. *See Standard Oil Co. v.
United States*, 221 U.S. 1, 58–62 (1911). The rule of reason instructs that "many forms
of concerted action are to be evaluated under a flexible, case-by-case standard." *Jacobs
v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1333 (citing *Standard Oil Co.*, 221 U.S. at
58–62); *see also Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d

1065, 1071 (11th Cir. 2004) (explaining that Section One claims that do not allege per se antitrust violations are analyzed under the rule of reason).  Under the rule of reason, the factfinder "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).

Although different elements apply to Section One and Section Two claims, both claims require a showing of harm to competition within a "relevant market." *Spanish Broad. Sys.*, 376 F.3d at 1074.  The relevant market is comprised of two parts: (1) the product or service at issue and (2) the geographical area in which a potential purchaser may seek the product or service.  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002).  Under Section One, the "'relevant market' must have been harmed by an unreasonable restraint on trade." *Spanish Broad. Sys.*, 376 F.3d at 1074 (citing *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 421 (11th Cir. 1984)).  Under Section Two, "the alleged monopolist must possess enough power or potential power in the 'relevant market' in order to harm competition." *Id.* (citing *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293–94 (11th Cir. 2004)).

In order to determine the scope of the relevant product market, there must be an examination of not only the product at issue but also its reasonable substitutes, if any.  *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or

commerce', monopolization of which may be illegal."). Thus, reasonable substitutes are the products to which consumers reasonably switch their consumption choice in place of the product at issue. *See id.* at 404 (finding aluminum foil, waxed paper, and Saran wrap to be reasonable substitutes of the cellophane product at issue). The "parameters of a given market are questions of fact." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573–74 (11th Cir. 1991) (holding that district court erred in granting summary judgment by accepting one party's parameters of the geographic area as the relevant geographic market when there were material differences of fact as to whether the geographic market was unitary or non-unitary).

Here, the parties dispute whether emergency room services offered by Defendant and other acute care hospitals should be included in the definition of the relevant product market. Defendant contends that these services should not be included in the definition because there are non-hospital providers such as urgent care facilities, ambulatory surgery facilities, and doctors' offices that are interchangeable substitutes for some of the emergency room services that Plaintiffs contend fall under the definition. (Dkt. 71 at 7–14.) In support of its position, Defendant cites numerous authorities. (*See id.*) (citing *Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460, 478 (7th Cir. 2016); *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016); *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327 (11th Cir. 2010); *United States v. Rockford Mem. Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990); *Fed. Trade Comm'n v. Tenet Health Care Grp.*, 186 F.3d 1045, 1051–52 (8th Cir. 1999); *Fed. Trade Comm'n v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995); Phillip E. Areeda &

Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 565, n. 19 (2023)).

In contrast, Plaintiffs contend that emergency room care should be included in the relevant product market definition because the Amended Complaint contains plausible facts to support their contention that acute care hospitals' sale of emergency room care is closely integrated with its sale of inpatient care such that the bundle of inpatient and emergency room services constitutes a single product market. (Dkt. 76 at 5.) In support, Plaintiffs reference allegations contained in their Amended Complaint. (*Id.* at 4–6.) First, the Centers for Medicare and Medicaid Services define an acute care hospital as a hospital that provides inpatient medical care and other related services for surgery, acute medical conditions or injuries. (Dkt. 56 ¶ 18.) Second, the University of Maryland Global Health Initiative states that within health systems, emergency room care serves as an entry point to acute care hospitals for individuals with emergent and urgent conditions. (*Id.* ¶ 22.) Third, the Mayo Clinic states that an acute care hospital's emergency room provides its full range of emergency care by relying upon integrated inpatient services. (*Id.* ¶¶ 24–25.) Fourth, Defendant's own summary data separates patients into three groups of Inpatient ED, Inpatient Elective, and Outpatient ED. Although Defendant does not describe how these categories of patients are defined, Plaintiffs contend that if "Inpatient ED" means that the patient came in through the emergency room, then 74% of the inpatients arrived through the emergency room department. (*Id.* ¶ 26.) These allegations, which

- 9 -

are accepted as true for purposes of the Motion to Dismiss, are sufficient to allege a relevant product market.

Defendant also relies upon *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327 (11th Cir. 2010) to support its contentions. In *Jacobs*, the Eleventh Circuit affirmed the district court's decision granting a motion to dismiss for failure to state a claim in part because the plaintiff failed to plead sufficient facts supporting the contention that memory foam mattresses constituted a submarket. *Jacobs*, 626 F.3d at 1336–39. The court held that the plaintiff's conclusory statement that "'[v]isco-elastic foam mattresses comprise a relevant product market, or submarket, separate and distinct from the market for mattresses generally, under the federal antitrust laws," raised the question of what exactly makes foam mattresses different from traditional mattresses. *Jacobs*, 626 F.3d at 1338. The court reasoned that the relevant product market definition as pleaded did not comply with *Twombly* because the complaint did not explain why consumers would treat memory foam mattresses differently. *Id.* at 1338–39. This case is distinguishable from *Jacobs*. Here, Plaintiffs plausibly allege that acute care providers of inpatient and emergency room services are not interchangeable substitutes with urgent care facilities or doctors' offices because providers of inpatient and emergency room services provide 24/7 immediate services, are staffed in one location with physicians specializing in specific areas such as neurology, and have full laboratory resources in one location necessary for immediate diagnosis and treatment—unlike urgent care facilities and doctors' offices. (Dkt. 56 ¶¶ 24–25.) *See Jacobs*, 626 F.3d at 1338–39 (explaining that discovery is necessary to determine

whether an interchangeable substitute actually exists, but plaintiff must provide some evidence plausibly suggesting why a potential substitute is not interchangeable).

Additionally, there is no requirement that all interchangeable substitutes be affirmatively pleaded as Defendant contends. *See Omni Healthcare, Inc. v. Health First, Inc.*, No. 6:13-cv-1509-Orl-37DAB, 2015 WL 275806, at *10 (M.D. Fla. Jan. 22, 2015) ("A market's product and geographic dimensions are questions of fact that often require discovery to precisely articulate and need not be pled with specificity; to survive a motion to dismiss, antitrust plaintiffs need only 'present enough information in their complaint to plausibly suggest [those dimensions'] contours.'") (citing *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d at 1336).

Moreover, in the Motion, Defendant does not argue that the Amended Complaint lacks enough information to determine the product market's contours. (*See* Dkt. 71.) Instead, Defendant takes issue with the contours as set forth by Plaintiffs. This disagreement is one of the central factual disputes of the case. The parameters of the relevant product market pose questions of fact that should not be decided on a motion to dismiss. *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 825 (11th Cir. 2015) ("[o]ur caselaw makes clear that '[t]he definition of the relevant market is essentially a fact question.'") (quoting *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993)); *Thompson*, 934 F.2d at 1574 ("The question of whether a series of transactions or whether a given product constitutes a separate market is a question of fact."); *see also Omni Healthcare*, 2015 WL 275806, at *12 ("Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases") (quoting *Spanish Broad. Sys.*,

376 F.3d at 1070) (internal quotations omitted).  As the Complaint sufficiently pleads the relevant product market, the Motion is denied as to Counts One and Three.

### B. Florida Antitrust Act (Count Four)

Under Florida law, it is "unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in [Florida]," Fla. Stat. § 542.19.  To prevail on a Florida Antitrust Act claim, a party must define the relevant product market.  *Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1224 (M.D. Fla. 2004).  The Florida Legislature has indicated that courts should interpret the Florida Antitrust Act in the same manner as the Sherman Act.  Fla. Stat. § 542.32 ("It is the intent of the Legislature that . . . due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes."); *see All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and caselaw."). As the same relevant product market analysis set forth above applies to Plaintiffs' Florida Antitrust Act claim, the Motion is denied as to Count Four for the reasons mentioned above.

### CONCLUSION

Accordingly, it is **ORDERED** that:

1.  Defendant Health First, Inc.'s Motion to Dismiss the First, Third, and Fourth Causes of Action of Plaintiffs' First Amended Class Action Complaint (Dkt. 71) is **DENIED**.

2. On or before **September 19, 2024**, Defendant shall file an answer to Plaintiffs' First Amended Class Action Complaint (Dkt. 56) in accordance with Federal Rule of Civil Procedure 12(a)(4)(A).

**ORDERED** in Orlando, Florida, on September 5, 2024.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record