UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| LAURA POWERS, CHRISTINA ROSEAN, Individually and on Behalf of Those Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>HEALTH FIRST, INC.,<br><br>Defendant. | No. 6:23-cv-00375-JSS-RMN |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
AND MEMORANDUM IN SUPPORT**

Plaintiffs Christina Rosean and Laura Powers respectfully submit this Motion for Class Certification and Memorandum in Support.[1] They seek certification of the following damage Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3):

> Plaintiffs represent a Class of (a) persons insured by health plans and (b) their health plans which purchase inpatient and emergency room hospital care from Health First's acute care hospitals on behalf of the persons, or members of the persons' families covered by their health plans. Covered Class care is ascertained and identified by (a) Health First hospital inpatient place of service location code 21 (Health First inpatient facilities) and Diagnostic Related Group ("DRG") codes which Health First is required to maintain and use for claim processing by federal and state mandate; and (b) Health First hospital emergency place of service location code 23 (Health First emergency room facilities) and Current Procedural Terminology ("CPT") codes, codes which Health First is required to maintain and use for claim processing by federal and state mandate.

---

[1] The Second Amended Case Management and Scheduling Order (Dkt. 132) permits this Memorandum to be no more than thirty-five (35) pages in length.

The Class seeks relief for its members' direct payments to Health First for this relevant care on or after March 1, 2019. For Class persons, such payments are defined as their co-insurance payments, all or in part, computed as percentages of Health First's pricing, and not limited by health plan annual, out-of-pocket maximums or otherwise. Their Class plans' payments are defined as all plan payments, all or in part, to Health First for covered care.

First Amended Complaint ("FAC") ¶143 (Dkt. 56).[2] Plaintiffs also seek certification of an injunctive Class pursuant to Fed. R. Civ. P. 23(b)(2). *Id*. ¶148.

Plaintiffs allege that Class patients and their plans receiving inpatient care and emergency room care at Health First hospitals during the Class damage period have paid above-competitive, monopoly pricing because of Health First's unlawful (a) monopoly maintenance; (b) horizontal market division; (c) exclusive dealing; and (e) violation of the Florida Antitrust Act under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and Fl. Stat. §§ 542.15-542.36. FAC ¶¶ 151-178.

## I.    HEALTH FIRST UNLAWFULLY MAINTAINS ITS MONOPOLY

As alleged with plausible and specific detail, the relevant product market encompasses the sale of the defined inpatient and emergency room care by Health First and competing acute care hospitals. FAC ¶¶ 17, 23. The hospitals competing in the

---

[2] Excluded from this class are (a) payments by persons which are set at fixed amounts by insurance plan or otherwise regardless of the cost of the procedure, including co-payments; (b) persons' insurance deductible payments to Health First; (c) persons employed by Health First, Inc. and its subsidiaries and Adventist and its subsidiaries; (d) Health First and Adventist Health plans; (e) the Presiding Judge, employees of this court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court; and (f) plans with plans' enforceable arbitration provisions precluding antitrust [class] damage remedy in this matter. FAC ¶ 145. As contemplated in FAC ¶ 144, the sample DRG and CPT illustrative codes provided with the FAC have been revised or augmented after expert analysis -- and full discovery -- to test the capacities of Plaintiff class methodologies to be used at trial.

2

relevant product market are "acute care hospitals." *Id.* ¶ 18. The Centers for Medicare and Medicaid Services defines an "Acute Care Hospital" as "[a] hospital that provides inpatient medical care and *other related services* for surgery, acute medical conditions or injuries (usually for a short-term illness or condition)." *Id.* (emphasis in the FAC). One such *related* service in the relevant product market is the "Emergency Room/Department, a portion of the hospital where emergency diagnosis and treatment of illness or injury is provided." *Id.* (emphasis in the FAC).

Primary and intermediate care by physicians, outpatient surgery centers, and urgent care clinics are not positioned, and are frequently unable, to assume competitively the role of an acute care hospital. Within health systems, emergency room care in the relevant product market serves as an entry point to acute care hospitals "for individuals with emergent and urgent conditions." *Id.* ¶¶ 22, 24-25.

The acute care hospitals' inpatient care and emergency room care constitute a single, well-defined relevant product market. "While some subset of these services can be provided by other types of providers, such as physicians, surgery centers, or urgent care clinics, the bundle of inpatient and related emergency room services supplied by acute care hospitals is not duplicated by these other types of providers." *Id.* ¶ 23.

The relevant geographic market encompasses the sale of defined inpatient and emergency room care in Brevard County or Southern Brevard County. *Id.* ¶¶ 29-41. Health First's dominant and very high market share in the relevant market supports allegation of its market power given the existence of barriers to entry. *Id.* ¶¶ 42-52.

3

## II.    THE ANTITRUST CLASS ACTION MAKES MORE POWERFUL PRIVATE ENFORCEMENT

The antitrust laws are "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *Comty Commc'ns Co. v. Boulder*, 455 U.S. 40, 56 n.19 (1982) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972)). The class action enhances the efficacy of the private antitrust action by "permitting citizens to pool their resources to achieve a more powerful litigation posture." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972).

Certifying a class requires "rigorous analysis of the [R]ule 23 prerequisites." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009).

In *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013), the Supreme Court cautioned district courts not to "put[] the cart before the horse" by allowing their views of the merits to affect their analysis of the independent question whether a putative class satisfies the requirements of Rule 23. *Id.* at 460. "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." *Id.*  While class certification analysis may entail some overlap with the merits of the underlying claims, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at

the certification stage." *Id.*[3]

### III.    PLAINTIFFS HAVE STANDING

### A. Plaintiff Christina Rosean

Plaintiff Christina Rosean is a second-grade teacher at Ralph Williams Elementary School in Viera, Florida. She has been teaching in Brevard County for six years. Deposition of Christina Rosean (Ex. A) 16:24 to 17:8 ("Rosean Depos."). During the Class damage period she and her family have been insured by the Brevard County School Board Health Plan ("Brevard School Board Plan") which insures teachers and others in Brevard County. It is administered, but not funded, by Cigna Health and Life Insurance Co. *Infra* at 16-17.

Her claim as a damage Class member relates to her co-insurance paid, and her Brevard School Board Plan's payment, for her son John Rosean's emergency room care on August 18, 2022. "…[H]e was injured at school and his knee swelled up, oh my goodness, three times the size of its regular size and he could not walk, so I was very concerned about some serious injury…." Rosean Depos. 11:22 to 12:18.[4]

She first stopped at an urgent care clinic. When she was unable to move him from the car, because any slight movement caused him great pain, she took pictures and explained the situation to the doctor there, who told her to take him to an

---

[3] *See also* *Forsythe v. Teva Pharmaceutical Industries Ltd*, 102 F.4th 152, 157 (3d Cir. 2024); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (en banc).

[4] A school bully had chased him through the school. Her son ducked under a table in a common area to hide and was pulled out by his leg, which resulted in a knee injury, and the bully punched him in the head. *Id*. 23:13 to 24:3.

emergency room. She immediately took him to the emergency room at Health First Viera Hospital. *Id*. 38:6 to 39:23. There her son was examined by a physician and received "a lot" of x-rays from different angles and was fitted with a brace. *Id*. 45:6 to 46:1.

Health First billed her $1,428.20 in total for this one visit several months after the care, including a co-insurance billing of $206.17. Ex. B (Powers 00009-11). As a damage Class member she is seeking overcharge remedy for this co-insurance payment, as well as the associated Health First billing to the Brevard School Board Plan. *Id*. 52:2 to 17, 53:22 to 54:10, 97:9 to 99:15. The latter billing was $2827.61. Ex. B (Powers 00009-11). She paid her co-insurance obligation in full when she paid the $1,428.20. *Id*. 50:10 to 24, 54:8 to 55:5; Ex. B (Powers 00009-11).

As a proposed Class representative she also seeks class relief for other Class members' co-insurance payments to Health First, and the associated payments by their health plans, for Class inpatient and emergency room care. Rosean Depos. 11:12 to 21, 100:21 to 101:4.

### B.  Plaintiff Laura Powers

Plaintiff Laura Powers has served as a fifth-grade teacher at Audubon Elementary School located in Brevard County. She has taught in the County for 11 years and is a member of the Brevard Federation of Teachers acting until recently as its building representative. Deposition of Laura Powers (Ex. C) ("Powers Depos.") 18:2 to 16, 19:12 to 20:1.

Her late husband, Boyce Powers, received extensive inpatient care just before

his passing from Health First's Cape Canaveral Hospital and Holmes Regional Hospital during the Class damage period. She seeks overcharge remedy for the following payments made by the Brevard School Board Plan for her husband's inpatient care:

> July 2-6, 2021 (Cape Canaveral) $28,628.38
>
> July 9, 2021 (Cape Canaveral) $18,932.08
>
> July 13-14, 2021 (Holmes) $38,566.77
>
> July 18-22, 2021 (Cape Canaveral) $38,566.77.

Powers Depos. 125:18 to 131:4; Ex. D (Powers 00041, 00083, 000142, 000172). These payments totaled $124,694.

She also seeks overcharge remedy for her co-insurance payment. On behalf of her Brevard School Board Plan, administrator Cigna informed her she had a co-insurance obligation to pay $1,198.80 for her husband's Cape Canaveral care on July 2-6, 2021. *Id.* 125:18 to 126:12; Ex. D (Powers 00085). She has fully met this obligation with four payments to Health First of $50, $450, $350 and $350. Ex. E (Powers 000303, 000304, 000315, 000305, 000306).

Her son Stephen Powers went to the emergency room at Cape Canaveral Hospital on June 30, 2022 after a skateboarding accident to treat a possible concussion or injury to his face. Powers Depos. 35:5 to 9, 36:9 to 16.  He collided with a light post in a church parking lot. He was first taken an urgent care clinic which directed him to a hospital emergency room because he hit the light post "pretty hard with his head and [I] had make sure that there wasn't a concussion or any fracture to his eye socket." *Id.*

7

64:22 to 25, 65:12 to 66:10. Since apparently no co-insurance or plan billings were made for this care, she does not seek damage remedy, only injunctive relief, based on this care.

As a Class representative she also seeks Class relief for other damage Class members' co-insurance payments directly to Health First, and associated payments by their health plans, for Class inpatient and emergency room care. *Id.* 13:1 to 21, 25:1 to 10.

### C.  Article III and Antitrust Standing

To demonstrate Article III individual standing Ms. Rosean and Ms. Powers must allege a personal, actual injury, a causal connection between it and Health First's anticompetitive conduct, with the injury likely to be redressed by a favorable resolution of this matter. *Harrell v. Fla. Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010). Prior to the consideration of summary judgment, these individual standing elements are not particularly onerous, and will be satisfied by "general factual allegations of injury resulting from the defendant's conduct." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (emphasis supplied); *John v. Whole Foods Mkt. Grp., Inc.,* 858 F.3d 732, 736 (2d Cir. 2017); *Andreas–Moses v. Hartford Fire Ins. Co.*, 326 F.R.D. 309, 314 (M.D. Fla. 2018).

Covered by the antitrust claims of Ms. Rosean and Ms. Powers are their inpatient and emergency room procedures provided by Health First hospitals in the relevant market on or after March 1, 2019. FAC ¶¶ 143, 148. They and their plan have

directly paid Health First for billings encompassing unlawful monopoly overcharging for this care. FAC ¶¶ 138-142; *supra* at 6-7.

"[N]o one disputes that overpaying for a product results in a financial loss constituting a particularized and concrete injury in fact." *John,* 858 F.3d at 736. Further, their antitrust price injury would be addressed by a favorable outcome here. FAC ¶¶ 138-142.

Ms. Rosean and Ms. Powers must also demonstrate individual antitrust standing. that is, they must allege injury of the type the antitrust laws are intended to prevent, as well as be "efficient enforcers" of these laws. *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem. Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010). As such enforcers they have alleged direct, unlawful antitrust price injury materially caused by Health First exclusionary conduct. They are well-positioned with counsel to vindicate their antitrust claims. FAC ¶¶ 138-142.

## IV.   THE PROPOSED CLASSES SATISFY RULE 23(A)

### A.   Class Members Are Readily Ascertainable

Fed. R. Civ. P. 23(a) contains an implicit requirement that a named class plaintiff show the existence of an ascertainable class. *Andreas–Moses*, 326 F.R.D. at 314. Ascertainability requires "the class definition contain[] objective criteria that allow for class members to be identified in an administratively feasible way." *Id.* (internal quotation and citation omitted). "Administratively feasible" means that the identification of class members should be "a manageable process that does not require

9

much, if any, individual inquiries." *Bussey v. Macon County Greyhound Park, Inc.*, 562 F. App'x. 782, 787-78 (11th Cir. 2014) (citation omitted) (persuasive guidance). As demonstrated by the extensive class discovery from Health First, Class patients and their plans can readily be identified from Health First's inpatient and emergency room transaction and billing databases for the relevant care using Health First place of service codes for emergency room and inpatient care, as well as DRG and CPT codes, as set out in the class definitions. *Supra* at 1-2; *infra* at 26-27**.** These databases also identify those patients in the Class paying their co-insurance in full (as required by the Class definition) and entitled to overcharge remedy on these payments. *Infra* at 26-27.

### B.    Class Membership Is Sufficiently Numerous

Numerosity requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The general rule is that more than forty (40) members is sufficient to demonstrate that joinder is impracticable. *Hummel v. Tamko Building Prod. Inc*, 303 F.Supp.3d 1288, 1295 (M.D. Fla. 2017). Health First's transaction and billing databases for covered inpatient and emergency room care indicate that thousands of patients and their plans have received inpatient and emergency room care in the Class damage period since 2019. *Infra* at 26-27.

### C.    Questions of Law and Fact Are Common to the Classes

Rule 23(a)(2) requires there be "questions of law or fact common to the class." Unlike the predominance perquisite, this commonality is a "relatively light burden." *Andreas–Moses*, 326 F.R.D. at 315 (citing *Vega*, 564 F.3d at 1256). It

requires "at least one issue whose resolution will affect all or a significant number of the putative class members." *Id.*

Alleged are Class common issues as to monopolization and the three other antitrust violations, including the definitions of the relevant product and geographic markets; Health First's market power in the relevant market; and the exclusionary conduct maintaining Health First market power and monopoly overcharging. If each Class member pursued her or his claim individually, the member would have to prove the same antitrust violations using the same documents, witnesses, and other evidence.

### D.    Plaintiffs' Claims Are Typical of Patients and Plans in the Classes

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This prerequisite "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (citation and quotation omitted). It assesses whether a "sufficient nexus exists between the claims of the named representatives and those of the class at-large."[5]

As set out above, the violation claims of Ms. Rosean and Ms. Powers, and other patient members of the Class, all arise in common from the full range of

---

[5] *Andreas–Moses*, 326 F.R.D. at 315. A class representative's claim is typical if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. *Id.* (quotation omitted); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. at 407-08.

exclusionary Health First conduct maintaining its market power and enabling its monopoly overcharging of members of the Class. *Infra* at 20-21. The antitrust price injury for all is alleged to be monopoly overcharging levied on each relevant procedure during the damage period. FAC ¶¶ 138-142; *infra* at 27-29.

This monopoly overcharging is shared by the patient (through co-insurance payments) and the associated payments of the patient's plan. The patient pays the co-insurance for a billing (typically 20% of the Health First monopoly billing) and the patient's plan pays the remainder (typically 80%).[6] By way of example, assume a patient has a covered procedure billed at $1,000. If the patient has a 20% co-insurance requirement in her or his plan, the plan would pay $800 of the monopoly price and the patient $200. Assuming that $300 represents the amount the billing exceeds the estimated competitive price for the procedure (a 30% monopoly overcharge), the patient and her or his plan share this *same* $300 overcharge. With a 20% co-insurance payment, the patient has antitrust price injury and damages of $60 and the plan $240.

Although, as here, Ms. Rosean's and Ms. Powers' total co-insurance payments for all procedures during the damage period (beginning in 2019) are small relative to those of their Brevard School Board Plan, the violation and injury claims of each are typical of the claims of this plan, as well as the claims of other Class patients and their

---

[6] Patients in the damage Class are not claiming antitrust price injury on deductible and co-payments to Health First which are fixed and do not vary whether or not Health First is charging a competitive or monopoly price for a procedure. Further, claims are made only for patients who pay the full amount of their co-insurance obligations, and thus their full percentage share of the monopoly overcharging. That is, the co-insurance payments are not limited by an annual out-of-pocket cap or otherwise. FAC ¶¶ 143, 145.

plans. All patient and plan claims arise from the same monopolization and other antitrust violations. *Infra* at 30. They all also are based on the same methodologies estimating monopoly overcharging. FAC ¶¶ 138-142; *infra* at 21-29. In sum, Ms. Rosean's and Ms. Powers' claims and those of their Brevard School Board Plan are "reasonably co-extensive" with those of other patients and their plans in the Class.

### E.    Plaintiffs and Counsel Will Fairly and Adequately Represent the Class

**1. Adequacy of Proposed Class Representatives.** Adequacy of representation requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "A plaintiff can meet this requirement by showing that the class representative has common interests with the class members and by demonstrating that the class representative will vigorously prosecute the interests of the class through qualified counsel." *Disposable Contact Lens Antitrust*, 329 F.R.D. at 408 (citation omitted).

As to a named plaintiff's adequacy, the analysis requires two inquiries: "(1) whether any substantial conflicts of interest exist between the [proposed] representative[] and the class; and (2) whether the representative[] will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm. Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citation omitted). *See also Amchem Prods.*, 521 U.S. at 625. "[T]he existence of minor conflicts alone will not defeat a party's claim to class certification...." *Valley Drug*, 350 F.3d at 1189.

Rather, any "conflict must be a fundamental one going to the specific issues in

controversy." *Disposable Contact Lens Antitrust*, 329 F.R.D. at 408-409 (citing *Valley Drug*). There is a fundamental conflict where class members claim to have been harmed by the same conduct that benefited other members of the class, and the economic interests and objectives of the proposed representatives differ significantly from the economic interests and objectives of unnamed class members. *Id*. (quoting *Valley Drug*). If a named plaintiff has "vigorously represented" the class and is "capable of continuing to do so," it is adequate. *Id*. at 409.

When they retained their Class counsel, Ms. Rosean and Ms. Powers affirmed in their separate retention correspondences:

> (a) they are members of a Class of persons paying directly for relevant Health First acute care procedures; (b) they wished to serve as Class representatives; (c) they were briefed as to the time commitment required of them at various stages of the litigation; (d) they would be able to devote the time and effort, as described by Class counsel, to represent the Classes; (e) they would with Class counsel vigorously represent the interests of the Classes and cooperate with counsel (and other Class members as necessary) in the prosecution of the litigation; and (f) they were familiar with, generally understood, and agreed with, the allegations to be made on behalf of the Classes.[7]

They have met these commitments and are particularly well suited and motivated to prosecute the claims on behalf of patients and plans in the Class. Ms. Rosean is well aware of the emergency room and inpatient patients and their plans she seeks to represent by seeking relief from monopoly overcharging for Health First facility charges. Rosean Depos. 11:12 to 21; 100:21 to 101:4. She reviewed the original Complaint before its filing and has been frequently informed of the progress of this suit

---

[7] Ex. F ¶ 2(a)-(d); Ex. G ¶ 2(a)-(d).

by counsel since its initiation. *Id.* 56:21 to 57:7, 87:4 to 88:2. She sat for a class deposition on October 5, 2023. Ex. A.

She contends that Health First has a hospital monopoly in Brevard County created or maintained by Health First's conduct preventing physicians from referring patients to other competitive hospitals and thus allowing Health First to charge above-competitive pricing. Rosean Depos. 93:8 to 94:4.

Ms. Rosean is particularly motivated to prosecute this matter by the size of Health First's billings. "[T]he [facility] billing that we received from the one emergency visit was "shocking and very eye opening." *Id.* 13:13 to 23, 15:11 to 19, 16:16 to 17. While she was able to pay her co-insurance, the magnitude of the billings for other teachers in the Class "would break a lot of my colleagues…Brevard County teachers don't make a lot of money. And I was fortunate…that we could pay for this, but I know that bills like this would really hurt some of my colleagues. So that's really what motivated me to be a part of this [suit]." *Id.* 25:15 to 26:4. While her co-insurance payment was "negligible," the large billings "bleed into health care plans and that hurts all of us." *Id.* 26:9 to 14; *infra* at 16-17.

Further, Ms. Rosean "lives in Brevard County…[and] love[s] Brevard County, and [she] want[s] to see competitive pricing in Brevard County and if I can help with that, then that's what I'd like to [do]." "…[W]ho knows what I could be diagnosed with, my husband, my son" and just this one emergency room visit was "…very, very eye opening as to what potential hazards could happen." *Id.* 26:15 to 27:8.

Like Ms. Rosean, Ms. Powers has testified that she seeks Class remedy for patients their health plans "[who] have purchased… inpatient and emergency care from Health First … from March 1st, 2019 to the present." Powers Depos. 13:1 to 21, 25:1 to 10.  She brought this Class matter to help patients and their health plans receiving Health First inpatient and emergency room care "that have been overcharged because of Health First's practices." *Id.* 22:22 to 23:4. She seeks monopoly damages for Class patients' co-insurance payments, as well as her and their plans' associated payments for the covered care.  *Id.* 23:11 to 24:22. She sat for her deposition on October 3, 2023. Ex. C.

Here her testimony as the Audubon School's building representative for the Brevard Federation of Teachers (*supra* at 6), as well as the testimony of Ms. Rosean noted immediately above, address the need for important and substantial monopoly relief for teachers and others covered by the Brevard School Board Plan who reside in the Class. This has been emphasized by Mr. Anthony Colucci, who in recent years has served as the President of the Teachers Federation. He sued as a proposed class representative in the virtually identical, immediately antecedent Class claims before this Court in *Colucci, et al. v. Health First, Inc.*, Civ. No. 6:21-cv-00681-RBD-DAB. He has served on the Superintendent's Insurance Advisory Committee of the Brevard County School Board which advises the Superintendent on the acquisition of health care benefits for Brevard County teachers and other school employees who are Class members. Ex. H ¶ 3. He testified in his class deposition:

…In each and every paycheck teachers, custodians, administrators, retirees are paying premiums into the [self-insured Brevard School Board plan's] trust fund, and the school board is paying a premium into the trust fund as well…*[I]n part, because of what I believe to be the overpricing by Health First Hospitals, the school board has had to do several one-time infusions of millions of dollars to keep our plan afloat, as well as increase their contributions to the plan…[T]his is an ongoing issue for our hardworking employees to keep up with these outrageous costs.*

Deposition of Anthony Colucci (Ex. I) ("Colucci Depos.") 152:13 to 153:4 (emphasis supplied). In 2021, to fund "skyrocketing healthcare costs," the School Board paid approximately $10 million into the plan trust fund which prevented a teacher raise. *Id*. 22:6 to 24:20. In 2022 this additional funding was $7 million. *Id*. The School Board was facing a 17 percent premium increase in 2023. *Id*. 152:13 to 153:4.

In sum, Ms. Rosean and Ms. Powers are motivated, have vigorously represented the Class, and are capable of continuing to do so. Further, they have no conflict with other members of the Class, let alone a fundamental conflict. They and all patients and their plans in the Class seek monopoly overcharge and injunctive remedy for the same exclusionary and anticompetitive acts of Health First. FAC ¶¶ 138-42; *supra* at 11-12 (typicality). Like Ms. Rosean and Ms. Powers, all Class patients and plans seek to demonstrate the shared antitrust price injury and damages on payments for the relevant procedures using the same proof, as well as employ the same methodologies showing classwide antitrust price injury at trial. *Infra* at 21-29.

**2. Adequacy of Counsel.** Class counsel will adequately represent a class if they are "are skilled and adequate in all respects." *Disposable Contact Lens Antitrust*, 329

F.R.D. at 409. **"**This requires the court to evaluate a number of factors, including counsel's knowledge and experience with class action litigation, counsel's knowledge and experience with the substantive law governing the class's claims, the resources available to counsel to pursue the class's claims, the quality of counsel's litigation efforts so far, and any other relevant factor speaking to counsel's ability to represent the class's legal interests." *Hummel*, 303 F.Supp.3d at 1297.

The counsel declarations submitted here for the two firms seeking to represent the Class (*infra* at 32-33) describe multiple qualified attorneys with many years of experience working on class and complex civil litigation. They are more than adequately qualified, experienced, and capable to act as Class counsel under these criteria.

## V.   PREDOMINATE CLASSWIDE PROOF OF VIOLATION AND ANTITRUST PRICE INJURY

Plaintiffs also move to certify the damage Class under Rule 23(b)(3). FAC ¶ 143. It affords class status where (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

The predominance requirement examines whether a damage class is "sufficiently cohesive to warrant adjudication by [class] representation." *Amchem Prods.,* 521 U.S. at 263. "Predominance means the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole must

predominate over those issues that are subject only to individualized proof. Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Andreas–Moses*, 326 F.R.D. at 316 (internal quotation and citation omitted).

"The requirement that common questions of law or fact predominate means the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole[ ] must predominate over those issues that are subject only to individualized proof." *Lingard v. Holiday Inn Club Vacations, Inc.*, No. 23-cv-323-JSS-RMN, 2025 WL 495019, at *16 ( M.D. Fla., filed Feb. 14, 2025) (internal quotation omitted) (citing *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989)).

In support of Plaintiffs' capacity to show at trial classwide, predominate proof of antitrust violations, and resulting antitrust price injury, they submit the Initial Class Expert Report of economist and econometrician Dr. John Gale, Ph.D. Ex. J ("Initial Gale Rep."). With rigorous and painstaking analysis over well over a year, he opines as to (1) common economic proof of Health First's anticompetitive conduct affecting the entire, well-defined relevant market and the damage Class; (2) how this conduct maintains Health First's market power in the market allowing it to charge monopoly, above-competitive prices classwide; and (3) relying on a great deal of supporting data from Health First's transaction and billing databases, well-accepted regression and benchmarking econometric techniques *capable* of establishing at trial classwide antitrust price injury inflicted on patients and their plans in the damage Class.

### A.     Common Proof Predominates as to Health First's Antitrust Violations

To prove monopolization Plaintiffs must prove at trial (1) Health First's possession of monopoly power in a relevant market; and (2) its willful acquisition or maintenance of that power. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992).[8] As plausibly alleged and assumed true, and supported by Dr. Gale's expert analysis, the same evidence shall be introduced at trial to prove these elements whether or not the claims against Health First proceed as a class action or as individual actions. Health First's anticompetitive conduct has been inflicted throughout the relevant market causing antitrust price injury and damages on damage Class members. Its conduct has anticompetitive effect on the Class as a whole, or it does not. It either prevents more competition, more innovation, more choice, and lower prices, or it does not. Accordingly, whether Health First's conduct has violated the antitrust laws presents common questions predominating over any individual Class questions.[9]

---

[8] Such common showings also pertain to the monopolization alleged under the Florida Antitrust Act. Common classwide proof is also available to prove unlawful exclusive dealing by a showing that "the "practical effect" of Health First's exclusive dealing agreements with physicians make it infeasible for them to use hospitals competing with the Health First monopoly. *See McWane v. FTC*, 783 F.3d 814, 834 (11th Cir. 2015). Common classwide proof is also available to prove an unlawful *per se* or rule of reason antitrust violation due to the horizontal agreements between hospital competitors Health First and Adventist to allocate territories and care. *Topco*, 405 U.S. at 608-09.

[9] *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014) (predominance satisfied because alleged antitrust violation "affects all market participants"); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293, at *13 (S.D.N.Y., March 28, 2014) (concluding that" 'where plaintiffs were allegedly aggrieved by a single policy of the defendant[], and there is a strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited'") (internal quotation and

### B.    Common Proof Predominates as to Classwide Antitrust Price Injury

At trial a class representative must demonstrate classwide antitrust price injury (or impact) with proof that is predominately common. *See Disposable Contact Lens Antitrust*, 329 F.R.D. at 419. This proof must link the price injury to the exclusionary conduct underlying the liability alleged. *Comcast*, 569 U.S. at 35. *See also infra* at 30. A district Court must apply "rigorous analysis" of the facts and law to evaluate whether classwide proof of antitrust price injury is available at trial. *Id.* at 33.

**1. Dr. Gale's Qualifications.** Dr. Gale is eminently well-qualified by education and much experience to provide his expert opinions as to the predominance of common, classwide issues as to Health First's violations and the classwide antirust price injury materially caused by those violations. For well over a year he has conducted regression and benchmark studies of voluminous Health First transaction and billing data covering all Class patient and plan care, as well as third-party insurance data from competitive markets necessary to conduct his benchmark estimation of Health First competitive pricing "but for" its antitrust violations. Initial Gale Rep. at 6-7.

Dr. Gale is a Managing Director of the international consulting firm Secretariat Economists who earned his Ph.D. in Economics from the University

---

citation omitted); *In re Buspirone Pat. Litig.*, 210 F.R.D. 43, 58 (S.D.N.Y. 2002) (There is predominance where proof "of the allegedly monopolistic and anti-competitive conduct at the core of the alleged liability is common to the claims of all the plaintiffs.").

of Wisconsin-Madison with a specialization in industrial organization, encompassing in part analysis of antitrust issues. He has extensive economic and econometric consulting experience over thirty-five (35) years and in many contexts, including extensive experience analyzing hospital and physician markets (including the estimation of competitive pricing); class certification; and the modelling of competition and consumer demand to analyze antitrust issues including damages. *Id.*

Generally, to satisfy the predominance prerequisite, a plaintiff must "come forward with plausible statistical or economic methodologies" to demonstrate how damages can be calculated class-wide." *Lingard*, 2025 WL 495019, at *17. To show methodologies capable of showing classwide antitrust price injury at trial, he regresses *commonly observable factors* derived from Health First's transaction and billing databases which econometrically explain the setting of Health First's monopoly pricing during the Class damage period. *None* of this analysis requires individual class member testimonies or discovery. *Infra* at 25-27.

His regressions estimate how the Health First monopoly pricing would have shifted downward on average across Class patient and plan transactions with competition and but for Health First's anticompetitive conduct, using a well-accepted benchmark methodology. *Infra* at 27 -29.

**2. Four Standards Govern Adjudication of Plaintiffs' Capacity to Show at Trial Classwide Antitrust Price Injury.**

**(a) Plaintiff Expert Methodologies Must Only Have the *Capacity* to Show Classwide Price Injury at Trial.** As the Ninth Circuit en banc puts it, under Rule 23(b)(3) "a district court is limited to resolving whether the evidence establishes that a common question is '*capable*' of classwide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 626-680 (emphasis in the original) (citation omitted). So long as "'each class member could have relied on the plaintiffs' evidence to establish liability if he or she had brought an individual action,' and *that evidence 'could have sustained a reasonable jury finding' on the merits* of a common question," then a finding of predominance is appropriate. *Id.* at 667-68 (extensive reliance upon and quotation of *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 450, 455-57, 459-460 (2016)) (emphasis supplied).

**(b) Plaintiffs' Regression and Benchmark Methodologies Are Sufficient Unless No Reasonable Juror Would Accept Them.** Dr. Gale provides robust regression and benchmark methodologies demonstrating Plaintiffs' capacity to show classwide antitrust price injury. Unless his expert opinions and supporting facts are found unreliable and inadmissible under *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579 (1993), then their relative "persuasiveness is, in general, a matter for the jury." *Tyson Foods,* 577 U.S. at 459. "Reasonable minds may differ as to . . . [the correctness of the expert's opinion]. Resolving that question, however, is the near exclusive province of the jury. The District Court could have denied class certification on this ground only if concluded that no reasonable juror could have believed [the expert's

opinion]." *Id.*

Accordingly, in light of any forthcoming attacks by Health First's expert, this Court cannot fail to credit or disregard Dr. Gale's testimony and methodologies unless "no reasonable juror" could rely on them to conclude that Class members suffered antitrust price injury.[10]

**(c) Plaintiffs Are Not Required Now to Demonstrate Capacity to Show Classwide Damages, As Opposed to Classwide Antitrust Price Injury.** Although Dr. Gale's analysis of classwide antitrust price injury is helpful here, to achieve class certification Plaintiffs need not show now their capacity at this stage to calculate and prove at trial the damages for each class member.[11]

**(d) A Merits Evaluation as to the Probable Outcomes of the FAC's Plausible and Detailed Allegation Is Not Permissible, Including Its Definition of the Relevant Market.** As summarized above (*supra* at 2-3), Plaintiffs allege with substantial, plausible detail the definition of the relevant product and geographic markets for the sale of emergency room and inpatient care. *See* Opinion and Order

---

[10] *Olean*, 31 F.4th at 667-68 & n.11. *See also Nat'l ATM Council, Inc. v. Visa Inc.*, 2023 WL 4743013, at *9 (D.C. Cir., July 25, 2023) (It is not necessary for the district court at class certification "to focus on which of the conflicting [expert] models to credit."); *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable.").

[11] *See In re Urethane Antitrust Litig.*, 768 F.3d at 1258-1260. Indeed, "[t]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Moncal v. GEO Group, Inc,*, 882 F.3d 905, 922-923 (10th Cir. 2018) (internal quotation and citation omitted). *See also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785, 2020 WL 1873989, at *50 (D. Kan., Feb. 27, 2020).

Denying Motion to Dismiss the FAC (Dkt 103). Further, Dr. Gale provides quite extensive expert analysis supporting the plausibility of the relevant market alleged. Initial Gale Rep. at 25-41.

Any attack by Health First's expert on this merits definition should not be a basis for denying certification as this Court evaluates the availability of proof at trial of classwide antitrust injury or otherwise. "…Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent - but only to the extent - that they are relevant to determining wth1hether the Rule 23 prerequisites Further  for class certification are satisfied." *Disposable Contact Lens Antitrust*, 329 F.R.D. at 357 (citation omitted). Here this District Court relies on the Supreme Court's admonition in *Amgen Prods.*, 568 U.S. at 465-66, that "an evaluation of the probable outcome on the merits is not properly part of the certification decision."

**3. Using Commonly Observable, Predominate Factors, Regression Analysis Is Capable of Explaining Health First's Monopoly Pricing.** Regression modelling to show predominance is "a statistical tool used to determine the relationship between an unknown variable (the 'dependent' variable') and one or more 'independent' variables that are thought to impact the dependent variable." *In re Urethane Antitrust Litig.*, 768 F.3d at 1260 (citing Saks, Michael J., et al., *Reference Manual on Scientific Evidence* 179, 181 (2d ed.2000)). *See also* Initial Gale Rep. at 47.

Health First's monopoly pricing of all Class inpatient and emergency room care

has been revealed in common from discovery of Health First's transaction and billing databases. *Id.* at 45-47.

His analysis of Health First's databases demonstrates that covered Class patients and plans throughout the Class damage period can be readily ascertained under the Class definition. *Id*. at 45-46, 57-59. As to class numerosity, thousands patients and plans are identified as receiving emergency room and inpatient Class care during the damage period from 2019 to the present. *Id*. Further, these databases as discovered are capable of identifying patients which have fully paid their co-insurance obligations as required for them to be included in the Class. *Id*. at 59; *supra* at 12 n.6.

Such regression modelling is a well-established and capable means to show whether predominately common factors explain classwide Health First's monopoly pricing. In *Disposable Contact Lens Antitrust*, 329 F.R.D. at 384-85, 419-24, this District Court comprehensively analyzed precedent governing use of this modelling before accepting it as reliable to show classwide antitrust price injury. "If a regression model uses appropriate independent [or explanatory] variables, it can test and isolate the extent to which the actual prices paid by plaintiffs are higher because of a defendant's [anticompetitive] behavior" including in complex markets. *Olean*, 31 F.4th at 671 (internal quotation omitted) (citing Michael J. Saks, et al., *Reference Manual on Scientific Evidence* 179, 181 (2d ed. 2000)). "In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust

violations on the prices paid by class members." *Id.* at 677 (citation omitted). Circuits regularly accept such regression analysis to show predominately common, classwide antitrust price injury. *Id.* at 677 n.23.[12]

**4. Dr. Gale's Benchmarking Methodology Is Capable of Estimating How Health First's Commonly Explained Monopoly Pricing Would Have Shifted Downward on Average Across Class Procedures with Competition.** Here Dr. Gale contrasts with further regression analysis Health First's monopoly pricing for Class emergency room and inpatient care with the benchmark pricing for this care provided by Florida hospitals operating in competitive markets. Initial Gale Rep. at 44-60. His modelling *controls* for market factors that commonly explain the setting of these monopoly and competitive prices, but are *unrelated* to the anticompetitive Health First conduct maintaining its monopoly pricing above competitive levels in the relevant market. With these explanatory pricing factors taken into account, the regression analysis *isolates and estimates* how much Health First's monopoly pricing on average exceeds the benchmark competitive pricing of these competitive Florida hospitals. *Id.* at 48.

This benchmark methodology is well established as a capable means of estimating classwide antitrust price injury at trial. As this District Court has found

---

[12] *Citing Kleen Prod. LLC v. International Paper Co.*, 831 F.3d 919, 924, 927-28 (7th Cir. 2016); *In re Urethane Litig.*, 768 F.3d at 1251, 1256, 1260-61, 1263; *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 97, 106-08 (2d Cir. 2007**)**; *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188–89 (9th Cir. 2002); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-54 (3d Cir. 2002)**.**

"one way of demonstrating predominance is to show that there is a common method for proving that the class plaintiffs paid higher actual prices than in the 'but-for' [competitive] world, such as using an econometric regression model incorporating a variety of factors to demonstrate that [exclusionary conduct] was at work during the class period, raising prices above the 'but-for' level for all plaintiffs." *Disposable Contact Lens Antitrust*, 329 F.R.D. at 419 (internal quotation and citation omitted).[13]

Dr. Gale' appropriately demonstrates his model's capacity to generate an estimate of a percentage, average measure of price overcharging for all Class members' varying billings for the relevant care. This District Court has found that this use of averages to prove at trial  classwide price antitrust injury is acceptable. *Id.* at 389.[14]

**5. Shifting Any Uncertainty in Overcharge Estimation at Trial on to Plaintiffs, Rather Than the Malefactor Health First, Is Impermissible.** To be sure, Dr. Gale's modelling *estimating* Health First's classwide pricing that would have

---

[13] *See also Olean,* 31 F.4th at 677-78 (citation omitted); *Urethane Antitrust Litig.*, 237 F.R.D. at 452; *In re Polypropylene Carpet Antitrust Litig.*, 93 F.Supp.2d 1348, 1359-60 (N.D. Ga. 2000); *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 521-22 (S.D.N.Y. 1996).

[14] *See also Olean,* 31 F.4th at 677-681 (citation omitted). Average percentage declines in prices per class member are sufficient. *In re Zetia Antitrust Litig.*, 7 F.4th 227, 238 (4th Cir. 2021) ("[P]ractice of proving injury by classwide averages" is "common.") (internal quotation omitted); *In re Suboxone Antitrust Litig.*, 967 F.3d 264, 271 (3d Cir. 2020) (rejecting argument that the purchasers do not satisfy the predominance requirement "because their damages model only calculates aggregate damages"); *Kleen Prods..*, 831 F.3d at 927 (rejecting argument that "it is not enough for Purchasers to prove aggregate injury and one aggregate overcharge, without allocating how much of that overcharge was paid by each individual class member"). This is true in complex markets and even where the market is characterized by distinct products and individual negotiations. *Olean*, 31 F.4th at 677.

prevailed in a competitive relevant market -- that Health First has worked hard and long to suppress -- is not an exact science.

"…[T]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of uncertainty which his own wrong has created." *Associated Gen. Contractors of Cal.*, 459 U.S. 519, 552 (1983) (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)) (internal quotation omitted). "Where the but-for [competitive price] is uncertain, the plaintiff's burden of proving damages is, to an extent, lightened, for [the wrongdoer] shall bear the risk of the uncertainty which his own wrong has created." *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *16 (citing *Bigelow*) (internal quotation and extensive additional citation omitted). For this reason, "…it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566-67 (1981) (internal quotation and citation omitted).

Any uncertainties suggested by Health First expert's critique of Dr. Gale's robust and careful methodologies -- including his use of benchmark *estimation* -- does not defeat class certification. Any risk from uncertainties in his estimation is borne by Health First, the antitrust malefactor suppressing competition, and not by the Plaintiffs. Otherwise, this would unjustly free Health First from accountability for the massive, long term damages totaling hundreds of millions of dollars since 2019 imposed on hundreds of its patients and their plans.

29

Any Health First challenge to the "persuasiveness" of Dr. Gale's analysis of classwide price injury should be "left for summary judgment or trial, not for resolution at class certification." *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1185 (10th Cir. 2023) (citation omitted).

**6. Plaintiffs' Expert Analysis Meets the *Comcast* Standard.** Consistent with the Supreme Court's teaching in *Comcast*, 569 U.S. at 35*,* Dr. Gale's methodologies explicitly rely upon *all* Health First's monopoly and other anticompetitive conduct maintaining its market power and giving rise to classwide antitrust price injury.  Initial Gale Rep. at 11-25. *Comcast* "simply requires that 'any model supporting a plaintiff's damages case must be consistent with its liability case.'" *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016) (quoting *Comcast*, 569 U.S. at 35). *Comcast* poses no barrier to class certification where, as here, "…there is only one theory of antitrust injury, and that theory corresponds to a theory of liability." *In re Suboxone Antitrust Litig.*, 967 F.3d at 271 n.11.

Further, his regression benchmarking is designed to account for lawful factors -- rather than Health First's unlawful anticompetitive conduct -- contributing to its market power when estimating the but-for pricing. Initial Gale Rep. at 48**.** A district court should not dismiss the benchmarking without any explanation as to why "no reasonable juror" could find that the benchmark competitive pricing of Florida hospitals, contrasted to Health First monopoly pricing, were not sufficiently comparable to support overcharge estimation. *Supra* at 22-23. *See Tyson Foods*, 577 U.S.

at 459.[15]

## VI.    A DAMAGE CLASS ACTION IS SUPERIOR TO OTHER METHODS

The superiority requirement of Rule 23(b)(3) requires a plaintiff to show that a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy. The relevant factors from Rule 23(b)(3)(A)–(D) point to Class superiority here. The superiority inquiry focuses "not on the convenience or burden of a class action suit *per se*, but on the relative advantages of a class action suit over whatever other forms of litigation might be [] available." *Andreas-Moses*, 326 F.R.D. at 319 (internal quotation and citation omitted).

*First*, for the reasons that common issues predominate over non-common issues, a class member's interest in individual control does not counsel against certification. There is no indication that the hundreds of individual Class patients and their plans are interested in individually controlling this antitrust matter. *Second*, there are no other individual *purchaser* actions challenging the Health First violations and its monopoly overcharging. *Third*, it is desirable to concentrate the litigation in this federal forum. *Finally*, again because of significant, predominate common issues, there is no difficulty in managing this well-defined and ascertainable damage Class.

## VII.    THE INJUNCTIVE CLASS SHOULD

---

[15] *See also Nat'l ATM Council*, 2023 WL 4743013, at *11 (citing *Tyson Foods*) ("Defendants' contention that their model showing unharmed members is more accurate and credible than Plaintiffs' different models showing that all members were harmed is thus precisely the kind of material factual dispute that is better suited for adjudication of plaintiffs' injury and damages on the merits.") (internal quotation omitted).

**BE CERTIFIED**

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The injunctive Class (FAC ¶ 148) should be certified because Health First's antitrust violations have imposed classwide price injury and stifled competition in the past, and continue to threaten such injury in the future. To the extent Health First maintains its market power in the relevant market by its exclusionary conduct, all this conduct should be enjoined because Health First has acted on grounds generally applicable to the injunctive Class.

## VIII.    TWO FIRMS SHOULD BE APPOINTED AS CLASS COUNSEL

Under Rule 23(g)(1), unless a statute provides otherwise, a court that certifies a class must appoint class counsel. Fed. R. Civ. P. 23(g)(1). "In appointing class counsel, the court: must consider (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id*.

Plaintiffs have retained Byrd Campbell, P.A. and Berry Law PLLC as counsel for the Classes. The firms have extensive experience in successfully prosecuting class

actions, antitrust actions, and complex actions.[16] They respectfully submit they meet the above criteria. In total the firms have already devoted several hundred pretrial hours prosecuting the claims, and the virtually identical *Colucci* claims, over several years. They have also advanced large sums for expert and other Class costs over multiple years.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully contend that the Classes should be certified pursuant to Fed. R. Civ. P. 23(b)(3) and 23(b)(2) and the two proposed law firms be appointed as Class counsel.

Dated: May 16, 2025

Respectfully submitted,

BY: */s/ R. Stephen Berry*
Trial Counsel
R. Stephen Berry
*(Admitted Pro Hac Vice)*
**Berry Law PLLC**
1100 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 296-1212
sberry@berrylawpllc.com

Trial Counsel
Tucker H. Byrd
Florida Bar No. 381632
**Byrd Campbell, P.A.**
180 Park Avenue North, Ste 2A
Winter Park, FL 32789
Telephone: (407) 392-2285
TByrd@ByrdCampbell.com

---

[16] Declaration of Tucker Byrd ¶¶ 3-9 (Ex. K); Declaration of Stephen Berry ¶¶ 4-15 (Ex. L).

Ronald G. Meyer
**Meyer, Blohm and Powell, P.A.**
Post Office Box 1547
Tallahassee, FL  32302
rmeyer@meyerblohmlaw.com
Telephone: (850) 878-5212

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025 I have caused the foregoing to be served via the ECF system on counsel for the Defendant.

*/s/ R. Stephen Berry*
R. Stephen Berry